1  Alan D. Smith, Bar No. 89112
   ADSmith@perkinscoie.com
2  Amir Gamliel, Bar No. 268121
   AGamliel@perkinscoie.com
3  Bradley A. Cosman, Arizona Bar No. 026223
   (*pro hac vice* application pending)
4  BCosman@perkinscoie.com
   PERKINS COIE LLP
5  1888 Century Park E., Suite 1700
   Los Angeles, CA  90067-1721
6  Telephone:  310.788.9900
   Facsimile:  310.788.3399
7
   Proposed Counsel to Debtors-In-Possession
8

9              UNITED STATES BANKRUPTCY COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                  LOS ANGELES DIVISION

12

| In re | Case Nos.  2:15-bk-11084-SK |
|---|---|
| | 2:15-bk-11085-NB |
| STATE FISH CO., INC.; and | |
| CALPACK FOODS, LLC, | (Joint Administration Pending) |
| Debtors. | Chapter 11 |
| | **DECLARATION OF VANESSA DELUCA IN SUPPORT OF FIRST DAY PLEADINGS** |
| THIS FILING APPLIES TO: | |
| ☒ ALL DEBTORS | |
| ☐ SPECIFIED DEBTOR | |
| ☐ STATE FISH CO., INC. | |
| ☐ CALPACK FOODS, LLC | |

24  Vanessa DeLuca, under penalty of perjury, states:

25        1.    This omnibus statement of facts and declaration (this "***Declaration***") is submitted

26  in support of the chapter 11 petitions and first-day pleadings of State Fish Co., Inc. ("***State***

27  ***Fish***"), and Calpack Foods, LLC ("***Calpack***," and together with "***State Fish***," the "***Debtors***") in

28

LEGAL124138118.6

the above-captioned chapter 11 cases, to be filed before this Court on January 26, 2015 (the "**Petition Date**").

2.    I am the former Chief Executive Officer, a former employee, and former director of State Fish. I am also a former Manager of Calpack. I am intimately familiar with the Debtors' businesses and financial affairs. I submit this Declaration on personal knowledge.

3.    The statements set forth below are true to the best of my personal knowledge and, if called to testify to those statements, I would do so competently.

## THE DEBTORS

1.    **THE DEBTORS' BUSINESSES**

   (a)    ***State Fish***

4.    State Fish was founded in 1932 and began as a small local wholesale fish buyer in California. Under the leadership of Sam DeLuca, State Fish expanded from a small fresh fish company to an internationally-known import and export company operating its own processing and cold store facilities near the Port of Los Angeles.

5.    State Fish's core business is buying, processing, and freezing fresh fish sourced from local fishing boats in southern California (a.k.a. the "wet fish business"), as well as importing and repackaging frozen fish from national and international sources. State Fish then sells frozen fish on a wholesale basis to fish dealers and grocery store chains.

6.    Over the past several years, there has been a sharp decline in the abundance of fish and increased regulations limiting catch sizes. These factors have led to a decrease in the number of fishing boats, and have negatively affected State Fish's fish processing operations. For example, sardines and mackerel—once staples for State Fish—are now virtually nonexistent.

7.    Around December 2012, State Fish sold its majority interest in Atlantis Seafood, LLC, an importer and processor of various fish products, for approximately $5.5 million through a seller carryback transaction. As of the Petition Date, State Fish holds a non-interest-bearing note from a successor-in-interest to the buyer. That non-interest-bearing note has a principal balance of approximately $3.8 million, and monthly principal payment obligations of approximately $60,000. As of January 23, 2015, the note was current.

8.       In addition to fish processing, State Fish provides custom food processing and pasteurization services through a division called High Pressure Pasteurization Food Service ("**HPP**"). HPP operates in Wilmington, California in a plant owned by, and shared with, State Fish. HPP receives pre-packaged products from its customers which are then pasteurized using HPP's two state-of-the-art pasteurization machines and returned to the customer for shipment to the end user. HPP charges customers on a per unit basis for pasteurization, pack-off, and date code services.

(b)       *Calpack*

9.       In April 2012, State Fish created Calpack as a wholly-owned subsidiary to produce high quality custom food and beverage products. Calpack specializes in processing and packaging fresh juices, along with dips, sauces, marinades, salsas, soups, and salad dressings. Calpack customers either send large quantities of raw materials to Calpack's facility, or Calpack orders fruits and vegetables on the customer's behalf and the customer is billed directly. Much of the juices and products processed by Calpack are then transferred to HPP for pasteurization services. Calpack's facilities are leased and located in Torrance, California.

(c)       *Facilities*

10.       The Debtors' corporate headquarters facility is located in San Pedro, California. This facility has been leased from the Port of Los Angeles for more than 60 years on a month-to-month basis, and also serves as a wet-fish unloading station for State Fish.

11.       The Debtors own and lease several other facilities and properties. First, State Fish owns a 30,000 sq. ft. food processing and cold storage facility in Wilmington, California. This facility is known as Plant 1, and is shared with HPP. Second, State Fish leases a facility in Fullerton, California where up to 400 tons of fresh fish per day are processed, frozen, and exported. Third, State Fish leases facilities from the Ventura Port District for unloading of fishing boats in Ventura, California. Fourth, State Fish owns four contiguous empty lots on Quay Avenue in Wilmington, California. These empty lots are currently leased to a trucking company that services State Fish. And fifth, Calpack leases a food-processing facility in Torrance, California used for pressing and bottling juices, and other food processing.

(d)    ***Suppliers & Competition***

12.    For the fish business, State Fish maintains critical relationships with local California fisherman, as well as various foreign fish wholesalers (many of whom have been supplying fish to State Fish for decades). State Fish pays its suppliers the market rate on a per pound basis. State Fish's relationships with local fisherman are critical to its success and operations as local catch sizes continue to shrink due to regulations and environmental factors. In recent years the squid fishing season has grown shorter and the sardine catch has fallen dramatically. Overall, the Debtors have seen the decrease in available fish lead to a decrease in the number of local fisherman and increased competition among wet-fish processors. As such, the Debtors' historical relationships with local fisherman have become even more critical to the Debtors' viability.

13.    State Fish competes with approximately twelve other California buyers for fresh fish processing. Fish prices are determined by local competition and global availability of various species. State Fish primarily competes on its brand loyalty and support from long-time customers.

14.    HPP's custom food processing and pasteurization services require that the end products must be shipped and placed on store shelves in a matter of days from when they are pasteurized. This limits the geographic reach of Calpack and any competitors. Although Calpack had been the only operating copacking facility in Southern California, recently competitors have begun moving into the market.

(e)    ***Shareholder Litigation***

15.    The four largest shareholders of State Fish are all siblings of one another and children of the company's founders, Sam and Rose DeLuca. The four largest shareholders are: (1) Roseann Deluca (23.26%); (2) Vanessa DeLuca (23.03%); (3) Janet Esposito (21.33%); and (4) John DeLuca (11.02%). In addition, approximately 19% of State Fish's outstanding shares are held by Fred DiBernardo, as a trustee, for the benefit of John DeLuca's children. Fred DiBernardo is the uncle of the siblings and, as discussed further below, a former attorney to State Fish.

16.    The siblings have been for many years, and remain, embroiled in numerous lawsuits related to the Debtors. These lawsuits, described below, have essentially pitted the three sisters on one hand, against John DeLuca, his children, and Fred DiBernardo, on the other hand. The lawsuits have forced the Debtors to spend millions of dollars in attorneys' fees, incur substantial costs vacating Plant 2 (described below), and generally diverted attention away from the Debtors' operational and business activities.

(i)    *Plant 2 Litigation*

17.    Several separate lawsuits arose from property that State Fish used to lease and use as a fish processing plant known within the company as "Plant 2." Plant 2 had been bought by Sam and Rose DeLuca back in 1986. Shortly thereafter, State Fish began leasing Plant 2 and using the facility in its fish-processing operations. Around 1992, Sam and Rose DeLuca sold Plant 2 to their son John DeLuca. Following the sale, John DeLuca continued to lease the facility to State Fish.

18.    Around December 2005, John DeLuca raised the rent charged to State Fish for Plant 2 from $30,000/month to $45,000/month. This happened around the same time that John DeLuca and Fred DiBernardo—the siblings' uncle and State Fish's former attorney—were working together to open a competing fish-processing company (called J. DeLuca Fish Company, Inc.).

19.    After State Fish objected to the rent increase, John DeLuca initiated litigation to evict State Fish from Plant 2, and sought to have his competing fish company occupy the premises. During that same time, State Fish initiated litigation challenging the propriety and enforceability of John DeLuca's deed to Plant 2. Although State Fish was successful in the deed litigation at the trial level and John's deed was rescinded, the decision was overturned on appeal. John DeLuca and his competing fish company subsequently sued State Fish alleging (1) business interference damages resulting from State Fish's refusal timely vacate Plant 2 during the pendency of the deed litigation (the "***Interference Litigation***"), and (2) property damage and waste to Plant 2 allegedly attributable to State Fish's occupancy (the "***Waste Litigation***"). The Interference Litigation and Waste Litigation remain ongoing.

(ii)    *Shareholder Derivative Litigation*

20.    In addition to the Plant 2 litigation, John DeLuca and certain members of his immediate family brought a shareholder derivative action against State Fish and certain of State Fish's officers and directors (the "***Derivative Litigation***"). Through the Derivative Litigation, John DeLuca alleges, among other things, that State Fish's officers and directors: (1) received disguised dividends; (2) caused State Fish to pay the directors' personal legal expenses; (3) improperly refused to hold shareholder meetings and illegally failed to seat a director; and (4) failed to investigate allegations of wrongdoing at State Fish.

21.    On April 4, 2014, the Superior Court of California entered a "Tentative Decision." In the Tentative Decision, the Superior Court indicated it would enter an order: (1) removing certain directors of State Fish; (2) appointing provisional independent directors to replace those removed; and (3) requiring an accounting of legal fees State Fish expended on behalf of the individual defendants. No final order or judgment has been entered related to the Tentative Decision and the Superior Court has ordered post-trial briefing. Further, the director-defendants in the lawsuit have asked the Superior Court to conduct a second phase of the trial focusing on affirmative defenses.

22.    On October 20, 2014, the Superior Court entered a *Minute Order* which implemented a temporary stay precluding State Fish from entering into any agreements to sell State Fish assets or take any other steps to liquidate State Fish or any of its assets. On December 22, 2014, the Superior Court entered a second *Minute Order* continuing the temporary stay until a hearing scheduled for January 30, 2015.

2.    **APPOINTMENT OF INDEPENDENT BOARD MEMBERS, RETENTION OF CHIEF RESTRUCTURING OFFICER, & OTHER GOVERNANCE PROTOCOLS**

23.    Prior to April 2014, State Fish's board of directors had four members, comprising Roseann DeLuca, Janet Esposito, and myself (each sisters and shareholders of State Fish), plus Susan Ricci (State Fish's Chief Financial Officer and Chief Operating Officer).

24.    Around April 2014, Susan Ricci resigned as a board member, and State Fish appointed two independent directors (collectively, the "***Independent Directors***"). The

1   Independent Directors appointed were Mark Stolper and Kirk Waldron. Mark Stolper is the

2   Executive Vice President and Chief Financial Officer of Radnet, Inc. with significant experience

3   as a director for public and private companies. Kirk Waldron is a senior executive who has

4   worked as a chief executive officer and chief financial officer for both public and private

5   companies while also serving as a board member for multiple public companies. Prior to their

6   appointment, the Independent Directors had no prior relationship with the Debtors or any of the

7   Debtors' officers, directors, or shareholders. Both Mark Stolper and Kirk Waldron currently

8   remain on the board of State Fish as the Independent Directors, and together constitute the only

9   Directors of State Fish.

10          25.     During the time frame of November 2014 through January 2015, the Independent

11  Directors interviewed and considered several firms to provide financial advisory services in

12  connection with the Debtors' restructuring. On or about January 22, 2015, the Independent

13  Directors retained the firm Avant Advisory Group to provide Chief Restructuring

14  Officer ("***CRO***") services to the Debtors and, on January 24, 2015 designated George P. Blanco—

15  Avant Managing Director and Partner—to serve as the CRO for the Debtors. Prior to their

16  retention, Avant and Mr. Blanco had no prior relationship with the Debtors or any of the Debtors'

17  officers, directors, or shareholders.

18          26.     Mr. Blanco is a senior executive with over 30 years of industry and consulting

19  experience, performing financial and operational management for both financially distressed and

20  high growth companies. Mr. Blanco has been involved in a number of interim C-level roles to

21  stabilize business operations, rebuild management teams, and prepare businesses for refinancing

22  or sale.[1]

---

[1]      Among the first-day pleadings filed in this bankruptcy is the *Application for Interim and Final Orders Assuming the Debtors' Agreement with Avant Advisory Group and Approving Mr. Blanco's Appointment as Chief Restructuring Officer.*

27.     As CRO, Mr. Blanco reports directly to the Board (now comprised of only Independent Directors) without any incremental reporting layer to management. A complete list of Avant's and Mr. Blanco's duties and authority are set forth in the Avant engagement agreement attached to the Application for Interim and Final Orders Assuming the Debtors' Agreement with Avant Advisory Group and Approving Mr. Blanco's Appointment as Chief Restructuring Officer, filed contemporaneously with this Declaration.

28.     With the Independent Directors, and the retention of the CRO, I have determined that my resignation as a board member, officer, and employee is in the best interest of the Debtors. My resignation as a board member, officer, and employee—along with the resignations of Roseann DeLuca, Janet Esposito, and Susan Ricci discussed below—vested control of the Debtors with the Independent Directors and the independent CRO. This distances the Debtors from the cost and distraction of the shareholder litigation, which is negatively impacting the Debtors' financial and operating performance. My resignation as a board member, officer, and employee of State Fish, and Manager of Calpack, was effective January 23, 2015.

29.     To the extent the Independent Directors or CRO deem necessary or appropriate, and effective January 23, 2015, I have agreed to provide consulting services to the Debtors exclusively as requested by the Independent Directors or the CRO. Any consulting services I provide will be subject to terms of a consulting agreement and, unless otherwise requested by the Independent Directors or the CRO, be performed from outside the Debtors' facilities. Under terms of my consulting agreement, I will be paid a consulting fee of $125/per hour, a rate which is lower than the effective hourly rate of my salary at the time of my resignation.

30.     Also effective as of January 23, 2015, in order to further minimize the cost and distraction caused by the various litigation described above, Roseann DeLuca and Janet Esposito resigned as board members of State Fish, and resigned as employees of the Debtors. Roseann DeLuca has agreed, effective January 24, 2015, to provide consulting services to the Debtors exclusively as requested by the Independent Directors or the CRO. Any consulting services Roseann DeLuca provides will be subject to terms of a consulting agreement and, unless

otherwise requested by the Independent Directors or the CRO, be performed from outside the Debtors' facilities. Under terms of her consulting agreement, Roseann DeLuca will be paid a consulting fee of $75/per hour, a rate which is lower than the effective hourly rate of her salary at the time of her resignation.

31.     Consistent with the above, Susan Ricci resigned as an officer and employee of the Debtors effective as of January 23, 2015. Susan Ricci has agreed, effective January 24, 2015, to provide consulting services to the Debtors exclusively as requested by the Independent Directors or the CRO. Any consulting services Susan Ricci provides will be subject to terms of a consulting agreement and, unless otherwise requested by the Independent Directors or the CRO, be performed from outside the Debtors' facilities. Under terms of her consulting agreement, Susan Ricci will be paid a consulting fee of $110/per hour, a rate which is lower than the effective hourly rate of her salary at the time of her resignation.

3.     **THE DEBTORS' CAPITAL STRUCTURE**

(a)     ***Secured Indebtedness***

32.     In April 2014, State Fish's line of credit from Well Fargo expired, and was not renewed by Wells Fargo. In order to finance certain equipment acquisition costs, State Fish, as borrower, entered into a *Credit Agreement* (the "***Credit Agreement***") with Pan Pac LLC and Roseann DeLuca Revocable Trust dated 10/6/2011 (jointly and severally, the "***Lender***") on May 15, 2014.[2]

33.     Under the Credit Agreement, Lender agreed to make revolving loans to State Fish up to $7,175,000. As of the Petition Date, there was approximately $5.7 million of indebtedness outstanding under the Credit Agreement. State Fish is in default under terms of the Credit Agreement.

---

[2]     Pan Pac LLC and Roseann DeLuca Revocable Trust dated 10/6/2011 are affiliates of Vanessa Deluca and Roseann Deluca, respectively. As detailed below, Vanessa DeLuca and Roseann DeLuca respectively own approximately 23.03% and 23.26% of the equity interests in State Fish Co.

34.    Outstanding indebtedness under the Credit Agreement bears interest at the rate of 4% per annum.

35.    Obligations under the Credit Agreement are secured by a blanket lien on substantially all of State Fish's personal property. Lender filed a corresponding UCC Financing Statement with the California Secretary of State in order to perfect its security interest on May 21, 2014 at Filing Number 14-7412846996.

(b)    ***Unsecured Claims***

36.    As of the Petition Date, the Debtors believes there is approximately $1.5 million in prepetition trade-related general unsecured claims against State Fish, and $100,000 in prepetition trade-related general unsecured claims against Calpack.

37.    In addition, State Fish is the borrower under two contingent Promissory Notes related to irrevocable letters of credit issued by Farmers and Merchants Bank of Long Beach (collectively, the "***Letters of Credit***"). The promissory notes were issued in amounts of $600,000 and $1,000,000, and are secured by personal bank accounts of one of the Debtors' shareholders.

(c)    ***Equity Ownership***

38.    State Fish is a closely-held corporation, with its stock held by the following parties:

| Number of Shares | Name of Record Shareholder | Approximate Percentage of Total Shares Held |
| --- | --- | --- |
| 212 | Roseann DeLuca SFC Trust dtd. October 6, 2011 | 23.26 |
| 210 | Vanessa L. DeLuca SFC Trust dtd. October 6, 2011 | 23.03 |
| 100 ½ | John DeLuca | 11.02 |
| 194 ½ | Janet M. Esposito SFC Trust dtd. October 6, 2011 | 21.33 |
| 46 ½ | Fred DiBernardo, Trustee for John Adam DeLuca | 5.10 |
| 36 ½ | Fred DiBernardo, Trustee for Ryan DeLuca | 4.00 |
| 42 ½ | Fred DiBernardo, Trustee for Christopher DeLuca | 4.66 |
| 42 ½ | Fred DiBernardo, Trustee for Samuel DeLuca | 4.66 |

| 10 | Vanessa DeLuca, Successor Trustee for Caroline DeLuca | 1.10 |
|---|---|---|
| 8 | Vanessa DeLuca, Successor Trustee for Cristina DeLuca | 0.88 |
| 8 | Vanessa DeLuca, Successor Trustee for James DeLuca | 0.88 |
| 1 | Fred DiBernardo, Trustee (trust not stated) | 0.10 |
| 912 | Total Number of Shares Outstanding | 100 |

39.    Calpack is a wholly-owned subsidiary of State Fish.

4.    **CIRCUMSTANCES LEADING TO THE DEBTORS' BANKRUPTCY FILING**

40.    The Debtors' need to file bankruptcy results from a combination of factors.

(a)    ***Markedly Decreasing Fish Catches***

41.    State Fish's wet fish business is experiencing decreasing market share and profitability for a number of reasons. The wet fish industry as a whole has been directly impacted by negative environmental factors which have resulted in smaller catch quantities for several years. For example, environmental factors have moved sardines and mackerel—once abundant—to migrate out of local fishing waters.

42.    Increased permit requirements, more restrictive quotas, and loss of fishing grounds have further shrunk wet fish catch quantities and truncated the fishing season. For example, the sardine quota went from a high of 150,000 tons in 1990, to approximately 15,000 tons today. Further, restrictions and quotas now limit the fishing season to approximately five months.

43.    At the same time the market as a whole is shrinking, State Fish is facing increased competition from other processors. The shrinking market has led to industry consolidation and transformation. Whereas State Fish relies on relationships with a group of independent fisherman for its supply of fish, competing processors have invested millions to purchase their own fishing fleets in order to insure their access to fish. Overall, the environmental factors, decreased market size, and increased competition have decreased State Fish's market share and profitability.

(b)   ***Liquidity Pressures***

44.     State Fish is also facing a number of financial and short-term liquidity pressures. First, although HPP and Calpack are both profitable and cash flow positive, State Fish's wet fish business is currently experiencing significant cash flow shortages. Indeed, State Fish has been experiencing significant financial losses for some time. State Fish estimates its net loss for the 2014 fiscal year was in excess of $8 million. The wet-fish business continues to operate on a significant negative cash flow basis. These financial losses and cash flow shortages are putting significant financial pressure on HPP and Calpack.

45.     Second, State Fish's existing Credit Agreement (outstanding balance approximately $5.7 million) matures and becomes due on May 15, 2015. In addition, State Fish's outstanding Letters of Credit ($1.6 million) expire on May 16, 2015. State Fish must source replacement financing for these amounts, but its ability to do so on reasonable terms is materially negatively impacted by the declining profitability of State Fish's wet fish operations and the ongoing monthly deficits.

46.     Third, the fishing season begins around April each year. In order to maintain its market share and wet fish operations as a going concern, State Fish needs access to additional working capital to fund purchases of new fish for processing and pay for increasing labor costs. State Fish's access to working capital is constrained by the maturing Credit Agreement and Letters of Credit. In other circumstances, State Fish might be able to obtain third party financing for the business allowing it to make the purchases needed for the upcoming season. But given the company's litigation history, its unprofitability, and the other industry-related factors, it is highly unlikely that such financing can be obtained from traditional third party sources.

47.     The Independent Directors are working with the recently-retained Avant and Mr. Blanco to analyze the Debtors' restructuring opportunities. As part of that analysis, the Independent Directors, Avant, and Mr. Blanco are evaluating all restructuring opportunities, including whether an expedited sale of State Fish's fish or other businesses will maximize stakeholder value in these bankruptcies, and whether it is appropriate to retain an investment banker. Accordingly, the Debtors have filed these bankruptcies to provide the Debtors with a

1    chance to remove the cost and distraction of the ongoing litigation, and to provide the Debtors

2    with a breathing spell to consider restructuring opportunities, preserve cash, and preserve the

3    businesses as going concerns.

4                                          **FIRST-DAY PLEADINGS**[3]

5        48.    This Declaration is submitted in support of the factual allegations contained in the

6    following motions, filed contemporaneously with this Declaration.

7                (c)    ***Wage and Benefits Motion***

8                    (i)    *The Debtors' Workforce*

9        49.    As of January 23, 2015, the Debtors employed, collectively, 162 employees; 132

10   with State Fish and 30 with Calpack. State Fish employed 82 full-time employees and 50 part-

11   time employees, of whom 102 were paid hourly and 30 were paid an annual salary. Calpack

12   employed 18 full-time employees and 12 part-time employees, of whom 24 were paid hourly and

13   six were paid an annual salary. The Debtors also employ independent contractors from time to

14   time who provide necessary services relating to the operation of the Debtors' businesses. Only

15   one employee was covered by a collective bargaining agreement.

16       50.    The Debtors' employees perform a variety of critical functions including operating

17   the Debtors' business and performing many administrative, maintenance, accounting,

18   management, and other tasks. The employees' skills and their knowledge and understanding of

19   the Debtors' operations and customer relations are essential to the effective reorganization of the

20   Debtors' business. Without the employees' continued services, I do not believe an effective

21   restructuring of the Debtors will not be possible.

22       51.    If employees do not receive their prepetition benefits and compensation in the

23   ordinary course, they may suffer personal hardship and unnecessary distraction from their duties.

24   That could seriously undermine employee morale and cause some employees to resign their

25   _____

26   [3] All capitalized terms used in this section carry the same meaning as used in the respective first day
     pleadings to the extent not otherwise defined herein.

27

28

positions, causing immediate and pervasive damage to the Debtors' ongoing business operations. Given the size of the Debtors' workforce, any significant deterioration in morale at this time would substantially and adversely affect the Debtors and their ability to reorganize, resulting in immediate and irreparable harm to the Debtors' estates. In addition, because the independent contractors are a critical component of the workforce and are critical to the Debtors' business operations, the Debtors seek an order authorizing, but not directing, them to satisfy prepetition obligations owing to these workers under the terms of the agreements as they existed on the Petition Date.

52.    Because the Debtors have remained current on all their employee-related obligations through the most recent pay period, all accrued prepetition obligations owing to individual employees will be substantially less than the statutory cap of $12,475 for priority treatment set by Bankruptcy Code §§ 507(a)(4) and (a)(5).

(ii)    *Employee Obligations*

53.    The Debtors' Employee Obligations include wages, salaries, certain payroll deductions and withholdings, and Reimbursable Expenses.  Before the Petition Date, the Debtors customarily either paid or withheld all of these Employee Obligations in the ordinary course of business. The following describes the Employee Obligations and the estimated liabilities associated with each.

(1)    Salaries and Wages

54.    All employees are paid bi-weekly, approximately two weeks in arrears.  The Debtors remained current with all payroll obligations to employees through January 15, 2015, the last completed pay period before the Petition Date. The Debtors' next payroll is January 30, 2015. The Debtors' payroll is approximately $289,461.87 ($251,159.04 for State Fish and $38,302.83 for Calpack) per pay period in gross salaries and wages.[4] Certain of the Debtor's executive

---

[4] Salaries before any deductions or withholdings, including vacation payroll, and excluding the Debtors' obligations to taxing authorities on account of employees.

1  officers and other employees, including myself, resigned as salaried employees as of January 23,

2  2014. Thus, the Debtors' total payroll will decrease accordingly postpetition, but reductions in

3  payroll may be somewhat offset by increased consulting fees. Payments to employees are

4  processed internally.

5  (2)   Withholding

6  55.   The Debtors are required by law to withhold from an Employee's paycheck

7  amounts related to federal and state income taxes and social security and Medicare

8  taxes (collectively, the "**Withholding Taxes**") for remittance to the appropriate taxing authorities.

9  The Debtors must also match from their own funds social security and Medicare taxes withheld

10  and pay (based on a percentage of gross payroll) additional amounts for state and federal

11  unemployment insurance (the "**Employer Payroll Taxes**" and, together with the Withholding

12  Taxes, the "**Payroll Taxes**"). The Debtors withhold a total of approximately $64,060.27

13  ($57,216.53 for State Fish and $6,843.74 for Calpack) from all employees' paychecks for Payroll

14  Taxes during each payroll, which are funded through a direct withdrawal from the Debtors'

15  payroll account on the day payroll is made. Therefore, to the extent that any payroll has not been

16  processed for the prepetition period, the Debtors have not funded the Payroll Taxes.

17  (3)   Paid Time Off

18  56.   The Debtors provide Employees with (i) three sick days of paid time off ("**PTO**")

19  per year, and (ii) anywhere from one to four weeks of accrued vacation days per year depending

20  on seniority and rank, which accrue anywhere from 90 days to two years after their employment

21  anniversary date, and are pro-rated from the anniversary date to December 31st each year. Any

22  unused PTO is paid out at the Employees' respective rates by mid-November each year. All of the

23  Debtors' obligations pertaining to PTO for 2014 were satisfied prepetition in the ordinary course.

24  It is possible that at least some employees will have accrued PTO during the prepetition period

25  that ultimately will be unused.

26  (iii)   *Employee Benefits*

27

28

57.    As described in greater detail below, the Debtors provide its employees with various insurance options and programs, including health, dental and vision insurance, prescription coverage, and group term life insurance (collectively, the "***Employee Benefits***").

(1)    Health Insurance

58.    All employees are eligible to participate in health, dental and vision insurance plans and prescription coverage offered by the Debtors through HMO or PPO Benefits (the "***Health Plan***"). Under the Health Plan, employees and the Debtors each make monthly premium payments. The Debtors cover 87% of the minimum monthly premium for employees under an HMO plan, 75% for employees under a medical care PPO plan, and 66.5% on a dental PPO plan. The Debtors estimate that the average monthly amount paid under the Health Plan is, in the aggregate, roughly $58,096 which is due by the Debtors on the first, tenth or twentieth day of each month (depending on the insurance plan). The failure of the Debtors to pay their share of the Health Plan premiums would impose an undue hardship on the Debtors' employees and directors covered by the Health Plan, as those employees and directors receiving services under the Health Plan would become liable for satisfying those claims. The effect on morale and retention would be immediate and devastating.

(2)    Workers' Compensation

59.    The Debtors provide workers' compensation benefits to its employees at the statutorily-required levels. Under California state law, the Debtors must maintain the workers' compensation program to ensure prompt and efficient payment and reimbursement of their employees' claims. If the Debtors fail to maintain the workers' compensation program, the Debtors will be prohibited by state law from operating. The Debtors' payment of all workers' compensation amounts is, therefore, crucial to the continued operation of the Debtors' business. The Debtors' average premium paid in 2014 was $50,915.77. Premiums are due by the seventh day of each month.

(3)    Reimbursable Expenses

60.    In the ordinary course of business, the Debtors reimburse their employees for expenses and charges incurred in performing their duties or otherwise in connection with the

Debtors' business operations. Similarly, many business expenses are paid with personal credit cards and the Debtors routinely reimburse the holders of the credit cards in the ordinary course of business. From my personal experience, the monthly cost associated with this reimbursement policy is minimal.

61.     The Debtors' employees rely on their full compensation to meet their daily living expenses, and I believe they will be exposed to significant financial difficulties if the Debtors are not permitted to pay the Employee Obligations, Reimbursable Expenses and Employee Benefits. In fact, if the Debtors are unable to honor these obligations, employee morale and loyalty may be jeopardized at a time when their support is critical to the Debtors' reorganization efforts.

> (d)    ***Cash Management Motion***
>
> (i)    *Debtors' Bank Accounts and Cash Management System.*

62.     In the ordinary course of business, the Debtors use a centralized cash management system of inter-related bank accounts designed to efficiently collect, transfer, and disburse funds generated through the Debtors' operations and to accurately record those transactions as they are made (the "***Cash Management System***"). The principal components of the Cash Management System are described in detail below.

63.     The Debtors' bank accounts are located at Wells Fargo Bank, and Farmers and Merchants Bank of Long Beach. Payroll accounts used to fulfill the Debtors' payroll obligations are maintained with Farmers and Merchants Bank of Long Beach. Checking accounts for State Fish, Calpack, and HPP are maintained with Wells Fargo. The Debtors' bank accounts with Wells Fargo are used as the Debtors' general operating accounts to satisfy accounts payable, debt service, taxes, and other ordinary course operating obligations. A cash flow chart describing the flow of funds between the Debtors' five bank accounts is attached as Exhibit A to the Debtors' Cash Management Motion.

64.     The Debtors' principal sources of cash flow stem from the packaging and wholesaling of fresh fish and pasteurization and production of high quality food and beverage products (the "***Revenue***"). All Revenue is deposited directly into the operating (checking) account. Revenue deposited into the operating (checking) account is used to pay vendors and

1    cover other operating expenses. One day before employee payroll, amounts necessary to cover the

2    next payroll (which includes wages, salary, contributions to employee benefit and retirement

3    savings accounts, and other customary employee-related amounts) are moved from the operating

4    account into the payroll account.

5         65.    State Fish and Calpack currently operate on a stand-alone basis from a cash and

6    cost standpoint, with exception to insurance costs, which are paid for by State Fish and allocated

7    to Calpack accordingly. State Fish historically funded certain operating costs on behalf of

8    Calpack, including covering losses early on in Calpack's operations as well as costs associated

9    with Calpack's minority ownership interest in an entity called Drinkme. State Fish carries a

10    corresponding intercompany receivable from Calpack for such costs.

11         66.    A chart of the bank accounts reflecting all bank accounts identified above (the

12    "**_Bank Accounts_**") by account number and balances as of January 26, 2015 is attached to the

13    Debtors' Cash Management Motion as Exhibit B. All Bank Accounts are FDIC-insured and are

14    held at banks that are US Trustee-approved depository institutions.

15         67.    If the Debtors were required to close all prepetition Bank Accounts and open new

16    postpetition "debtor-in-possession" accounts, it would cause significant and unnecessary

17    disruption in the Debtors' businesses, would cause the estate unnecessary expense, and would

18    impair the Debtors' efforts to reorganize and maintain the value of their estate.  The Bank

19    Accounts comprise a part of an established Cash Management System that the Debtors need in

20    order to ensure smooth collections and disbursements in the ordinary course of its business.  The

21    disruption that would result from closing the current accounts and opening new accounts could

22    also cause customers and creditors to become alarmed.

23         68.    The Debtors' estates would also benefit from having authorization by the Court to

24    continue operating, in the ordinary course of business, under depository or similar contracts

25    between the Debtors and the banks (the "**_Depository Banks_**") where the Bank Accounts are

26    located.  Under the usual and ordinary terms that existed under those contracts before the Petition

27    Date, the Depository Banks are permitted to charge back and revoke provision credits for

28    deposited items that are returned unpaid and charge the amounts of these items against balances

1   from time to time on deposit in the Bank Accounts, and to assess and deduct from the Bank

2   Accounts customary periodic service charges.  The Debtors' estates would benefit from receiving

3   authorization to continue these ordinary course practices regardless of whether those items were

4   deposited pre-petition or post-petition and regardless of whether the items are returned prepetition

5   or post-petition.

6          69.      In order to avoid delays in payments to administrative creditors, to ensure as

7   smooth a transition into chapter 11 as possible with minimal disruption, and to aid in the Debtors'

8   efforts to successfully and rapidly complete this case, it is important that the Debtors be permitted

9   to continue to maintain their Bank Accounts in the ordinary course of business and under the

10   existing agreements between the Debtors and the Depository Banks.

11          70.      Likewise, the Debtors' estates would benefit from the Debtors maintaining their

12   existing Cash Management System. The cash management procedures employed by the Debtors

13   constitute ordinary and essential business practices similar to those used by other corporate

14   enterprises in the same industry.  It provides significant benefits to the Debtors, including the

15   ability to: (a) control and centrally manage corporate funds; (b) ensure the availability of funds

16   when necessary; and (c) reduce administrative costs by facilitating the movement of funds and the

17   development of more timely and accurate balance and presentment information.

18          71.      Requiring the Debtors to adopt new, segmented cash management systems at this

19   critical stage of this case would be unduly expensive, would create unnecessary administrative

20   problems, would negatively affect the Debtors' usual and ordinary operations, and would be

21   much more disruptive than productive. Consequently, maintaining the existing Cash Management

22   System during this case is in the best interests of all creditors and other parties in interest.

23          72.      The Cash Management System allows the Debtors to centrally manage all their

24   cash-flow needs and includes the necessary accounting controls to enable the Debtors, as well as

25   creditors, the US Trustee, and the Court, if necessary, to trace funds through the system and to

26   ensure that all transactions are adequately documented and readily ascertainable.  I am informed

27   by the Independent Directors and Mr. Blanco that the Debtors will continue to maintain detailed

28   records reflecting all transfers of funds.

(e)   ***Cash Collateral Motion***

(i)   <u>*The Debtor's Need And Proposed Use Of Cash Collateral*</u>

73.   After careful consideration, the Debtors' Independent Directors have indicated that they believe State Fish urgently and immediately needs to use the cash it generates from the postpetition operation of its business to continue operating as a going concern. Cash is needed to, among other things, pay postpetition operating expenses including payroll.

74.   The Debtors' Independent Directors have indicated that State Fish will only use cash collateral in accordance with the collateral budget attached as Exhibit A to the Stipulation for Use of Cash Collateral (as included in Exhibit A to the Debtors' Cash Collateral Motion, the "***Budget***"), the Stipulation, and any orders from this Court. The Debtors' Independent Directors, together with Avant and Mr. Blanco, developed the Budget reflecting a cash flow forecast taking into account anticipated cash receipts and disbursements. The Budget includes the cost of labor, payroll taxes, insurance, utilities, and ordinary course expenses projected for the postpetition period. The Independent Directors, together with Avant and Mr. Blanco, have indicated that the expenditures are essential to current operation of State Fish's business, and that they are also ordinary, customary, and consistent with the State Fish's prepetition operations in all material respects.

75.   The Debtors' Independent Directors, together with Avant and Mr. Blanco, have indicated that use of cash collateral under terms of the Stipulation will not only protect and preserve State Fish's assets by maintaining the business as a going concern, but will also enhance the value of the business by generating additional revenue. Conversely, based on information and belief, any interruption in operations of State Fish will impede its ability to collect and expend cash generated from the operation of the business and will jeopardize the going concern value of the business and, thus, the value of the estate.

(f)   ***Application for Interim and Final Orders Assuming the Debtors' Agreement with Avant Advisory Group and Approving Mr. Blanco's Appointment as Chief Restructuring Officer.***

76.   After careful consideration, and consistent with their sound business judgment, the Debtors' Independent Directors selected Avant to provide CRO services in connection with these

1   chapter 11 cases. The Debtors' Independent Directors have indicated that Avant's and Mr.

2   Blanco's services are imperative to their successful administration of these chapter 11 cases, and

3   that they are well-qualified to provide their services to the Debtors in a reasonable manner.

4          77.    I am informed and believe, and on that basis allege that the Engagement Letter was

5   negotiated in good faith and at arm's-length between the Debtors' Independent Directors and

6   Avant.  The Debtors' Independent Directors have indicated that Avant, Mr. Blanco, and the

7   Additional Personnel assigned to this engagement have extensive experience providing

8   management and financial services to distressed companies, that their services are integral to the

9   success of these chapter 11 cases, and that denying the relief requested in the foregoing

10  application would require the Debtors to engage a new CRO who lacks a similar understanding of

11  the Debtors' business and restructuring goals, both already in progress and those to be

12  implemented.

13         78.    The Debtors' Independent Directors have indicated that the fee structure with

14  Avant is consistent with and typical of compensation agreements entered into by Avant and other

15  comparable firms in connection with the rendering of similar services under similar

16  circumstances.  They have also indicated that the terms of the Engagement Letter are within the

17  range of those for senior executive officers employed with companies of comparable size, value

18  and reputation. The compensation structure agreed upon between the Debtors and Avant is set

19  forth in detail in the Engagement Letter.

20         79.    The Debtors' Independent Directors have indicated that, to the best of their

21  knowledge, Avant is a "disinterested person," as the term is defined in section 101(14) of the

22  Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code. Furthermore, the

23  Debtors' Independent Directors have indicated that to the best of their knowledge, information

24  and belief, and based upon the Blanco Declaration concurrently filed with the above-referenced

25  application, none of Avant's past or existing engagements would, or appears to, create an interest

26  materially adverse to the interests of the Debtors, their creditors, or their equity security holders.

27              (g)    ***Application to Employ Perkins Coie LLP as Debtors' Counsel***

28

80.     The Debtors' Independent Directors have indicated, and I concur, that Perkins Coie has obtained a detailed familiarity with the Debtors' businesses, capital structure, and financial affairs through its prepetition representation of the Debtors. The Debtors engaged Perkins Coie to serve as general bankruptcy counsel in connection with the planning and implementation of these chapter 11 cases in light of Perkins Coie's extensive expertise in large Chapter 11 reorganizations. Perkins Coie has the necessary background to deal effectively with the full range of potential legal issues and problems that may arise in the context of this chapter 11 cases.  Accordingly, the Debtors' Independent Directors have proposed to employ Perkins Coie to render the services as more fully set forth in the above-referenced application.

81.     The Debtors' Independent Directors have indicated that, to the best of their knowledge, Perkins Coie is a "disinterested person," as the term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code. Furthermore, the Debtors' Independent Directors have indicated that to the best of their knowledge, information and belief, and based upon the Smith Declaration concurrently filed with the above-referenced application, none of Perkins Coie's past or existing engagements would, or appears to, create an interest materially adverse to the interests of the Debtors, their creditors, or their equity security holders.

82.     The Debtors' Independent Directors have indicated, after careful consideration, that the Debtors' fee arrangement with Perkins Coie is similar to fee arrangements that have been authorized in countless other chapter 11 cases in which Perkins Coie and many other similar firms have rendered services and is reasonable in light of industry practice, prevailing market rates, Perkins Coie's experience in reorganizations, and the scope of the work to be performed. Accordingly, the Debtors' Independent Directors believe that the fee structure is both fair and reasonable.

83.     The Debtors' Independent Directors have indicated that they believe Perkins Coie is well qualified to represent the Debtors effectively and efficiently in these chapter 11 cases, and that Perkins Coie's resources, capabilities, and experience in advising the Debtors are crucial to the Debtors' successful restructuring. As such, the Debtors' Independent Directors have

1 | / / /

2 | / / /

3 | / / /

1   indicated, and I agree, that employing Perkins Coie is in the best interests of the Debtors, their

2   estate, their creditors, and other parties-in-interest.

3   Dated:  January 26, 2015

4                                                       /s/          V  DeLuca

5                                                       Vanessa DeLuca
                                                        Shareholder and Former CEO

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28